Davis *v.* Winslow.

ABNER DAVIS & *als. versus* HEZEKIAH WINSLOW & *als.*

Each person has an equal right to the reasonable use of navigable rivers, or public streams, as public highways. ·

What constitutes reasonable use depends upon the circumstances of each particular case, and no positive rule of law can be laid down, to define and regulate such use with entire precision.

In determining the question of reasonable use, regard must be had to the subject matter of the use; the occasion and manner of its application, — its object, extent, necessity and duration, and the established usage of the country.

So, too, the size of the stream, the fall of water, its volume, velocity and prospective rise and fall, are important elements to be considered.

·In an action to recover for damages, sustained by the plaintiffs in consequence of the stoppage and detention of their logs by means of a boom erected by the defendants in Androscoggin River, the question of the reasonable use of the river, by the defendants, having been, *by consent* of both parties, submitted to the determination of the jury, — *it was held,* that thereby the parties waived the right to except to the instructions of the presiding Judge on that point.

EXCEPTIONS from the rulings and instructions of WALTON, J., at *Nisi Prius;* and ON MOTION of the defendants to set aside the verdict.

This was an action to recover for damages sustained by the plaintiffs, in consequence of the stoppage and detention of their logs by means of a boom erected by the defendants in the Androscoggin River, at Milan, in the State of New Hampshire.

The plaintiffs' case, as set forth in the first count in their writ, is, — " for that the plaintiffs, on the first day of May, A. D. 1861, and on each and every day between said first day of May and the day of the date of this writ, [October 22, 1861,] owned and possessed a large quantity, to wit : — five millions feet, board measure, of pine, spruce and hemlock board-logs and timber, which said logs and timber they had, on and between said days, deposited in and upon the Androscoggin River, at Milan, in the county of Coos, and State of New Hampshire, for the purpose of being floated and driven in and upon and down said river to the steam

Davis *v.* Winslow.

sawmills of the plaintiffs, situated on the banks of said river, in said Bethel; and the plaintiffs aver that the said Androscoggin River, from its rise to it's mouth, to wit, from the place where said logs and timber were deposited, in said Milan, to the said mills in said Bethel, on said first day of May was, ever since has been, and now is, a public highway for all persons to go upon and navigate with their boats and rafts of timber, and over and upon and down which to drive and float their logs, timber and lumber, at their free will and pleasure, and without any let or hindrance whatsoever. Yet the defendants, well knowing the premises, while the plaintiffs so owned and possessed said logs and timber, to wit, on said first day of May, and on divers other days and times, between said first day of May and the day of the date of this writ, and while said logs and timber were so landed and deposited in said river for the purpose aforesaid, did, by themselves, their agents and servants, unlawfully, unjustly and wrongfully keep and detain said logs and timber, at said Milan, by means of a certain boom then and there constructed and built in the said river, by the said defendants, whereby the free navigation of said river was obstructed. And the plaintiffs aver, that the defendants thereby, by means of said boom, then and there so obstruct-ed the said river, at said Milan, as to render said river impassable and unnavigable, and unfit for the public to pass over and upon said river, with their boats and rafts of timber, and unfit and inconvenient to float logs and timber upon and down the same. And the plaintiffs further aver that, by reason of the aforementioned obstruction, their logs and timber were detained and kept back until after the rise of water in the said river had become unfit and unsuitable to float their said logs and timber, to such an extent, that they, the plaintiffs, were compelled to abandon a great portion of their said logs and timber, to wit, one million feet board measure, between said place of deposit, in said Milan, and their said mills, in said Bethel. And the plaintiffs further declare and allege, that they were put to a great expense,

to wit, an expense of one dollar for each and every thousand feet board measure, by reason of their detention at said Milan, caused by said boom, built by the defendants as aforesaid, in driving their said logs from said place of deposit thereof, in Milan, to their said mills, in said Bethel, over and above what they would have been to and at had not said boom been built. Whereby, and by force of the statute in such case made and provided, an action hath accrued to the plaintiffs to have and recover the damage by them sustained in this behalf, and for which this action is brought."

It was admitted that the Androscoggin river, at the place in question, was a public highway, capable of, and being used for, floating logs and timber to market, and that the defendants, being owners of sawmills at Berlin Falls, in New Hampshire, on said river, erected, for their own convenience and the operation of their mills, the boom complained of, and that, at or about the time alleged, the defendants kept up said boom across said river, and thereby detained logs belonging to the plaintiffs, which were floating down said river, intermingled with logs belonging to the defendants, and thereby prevented said plaintiffs' logs from reaching their destination, at Bethel steam mills, so soon as they otherwise would have done, and that thereby the plaintiffs suffered damage.

The evidence produced at the trial is fully reported, and is too voluminous to be here inserted; its substance will appear from the arguments of counsel.

The defendants contended, that, under the circumstances proved in the case, they were justified in stopping and detaining the plaintiffs' logs in the manner which they did; that if the logs of the plaintiffs had, before reaching the booms in Milan, without any fault on the part of the defendants, become so intermixed with the logs of defendants, and of other persons, intended to be stopped and detained for manufacture at Berlin Mills, that the defendants could not stop and separate their own logs, and those of other

Davis *v.* Winslow.

persons to be there stopped, without stopping the plaintiffs' logs also, in the manner they did ; and, if that was a reasonable, proper and customary manner of separating logs, which had become intermixed in being driven to market, and there was no other practicable mode of accomplishing that object, the defendants would be justified in what they did, and had the right to detain the logs of the plaintiffs a necessary, reasonable and proper time for that purpose. And, if they used all reasonable and proper efforts to effect the purpose, and separate the logs as speedily as practicable, and detained them no longer than was necessary and indispensable, they were not liable for any damage occasioned thereby. And that, upon the evidence in the case, they had not detained them unnecessarily nor unreasonably.

The plaintiffs contended : —

1st. That the defendants had no right to detain their logs for any purpose nor for any period of time, to their damage, without being responsible for such damage.

2d. That if they had a right to stop and detain them at all, they could do so for a reasonable time only ; and that what was a reasonable time was a question, under the circumstances of the case, for the jury.

3d. That the evidence in the case showed that the logs might have been sorted and turned by, as they arrived at Winslow's boom, by using proper care and diligence, and thereby the great accumulation of logs above his boom have been prevented.

4th. That, from the testimony of the defendant Winslow, it plainly appeared that the great accumulation of logs at his boom was a public nuisance, endangering booms, piers, mills and bridges, and that they had suffered special damages from it, and that therefore they were entitled to recover.

The presiding Judge, among others, gave the jury the following instructions : —

"The rights of the parties to use the river as a public highway to run their logs were equal. Each was bound to

exercise his right in a reasonable manner, and with a due regard to the equal rights of the others. A party may sometimes lawfully so use and occupy a public highway as temporarily to exclude others from a like use; but no one has a right to encumber a larger space, or for a longer time, to the damage and inconvenience of others, than is reasonably necessary to the beneficial enjoyment of his own right, and any incumbrance of a highway beyond this, to the injury of others, is unlawful. In this respect, what is unreasonable is unlawful; and what is unlawful is unreasonable. And when there are no facts in dispute, whether in a given case the use of a highway, to the injury of others, was reasonable or unreasonable, is ordinarily a question of law, to be determined by the Court. Such questions are sometimes called mixed questions of law and fact, on account of the difficulty of separating the law from the facts, so as to determine in advance what in every case will constitute an unreasonable or unlawful use. If in this case the defendants, for their own private purposes and convenience, and for the sole purpose of stopping their own logs and separating them from others, constructed their boom across the entire width of the river, thereby stopping, not only their own logs, but the logs of the plaintiffs without their consent, from the 28th of May to the 10th of June, so that by reason of the fall of water the plaintiffs could not run their logs that season, such a detention, in my opinion, was unreasonable and unlawful; and if the defendants thereby caused and permitted an accumulation of logs belonging to themselves and others, that formed a solid jam, extending, as variously estimated by the witnesses, from three-fourths of a mile to a mile and a half up the river, and such accumulation of logs endangered the breaking of the boom and the destruction of bridges, dams, mills and other property upon and near the river, as stated by the defendants, it seems to me that a public nuisance was thereby created. I do not intend to use the term in an offensive sense, but I cannot perceive why a public danger, thus created, does not

Davis *v.* Winslow.

clearly come within the definition of a public nuisance; and it is a well settled principle of law, that when individuals receive special damage, — that is, damage which is immediate and direct, and not shared by the public, from such a nuisance, he may maintain an action therefor; and if the defendants, by means of their boom, created such a nuisance, and the injury complained of by the plaintiffs was caused thereby, they are entitled to recover. It has been urged in defence, that the plaintiffs' logs could not have been sooner released without increasing the danger of breaking the boom and thereby causing great loss to the defendants, and the destruction of property by the logs moving in a mass down the river. If such was the case, the error would consist, not in not releasing the plaintiffs' logs, and thereby increasing the public danger, after the jam had been formed, but in causing and permitting such an accumulation of logs; and if the necessity for detaining the plaintiffs' logs that length of time was unlawfully created, the defendants could not plead a necessity which they themselves had thus unlawfully created, in justification of the injury the plaintiffs had sustained. You may, however, determine for yourselves whether the detention in this case was, under all the circumstances, reasonable or unreasonable."

Both parties contended that the reasonableness or unreasonableness of the detention by the defendants of the plaintiffs' logs, was to be determined by the jury; and the jury were instructed that they might determine this question from the evidence in the case, with the consent of the counsel for both parties.

The verdict was for the plaintiffs. The defendants excepted.

*Evans & Putnam,* in support of the exceptions.

The rights of the parties to the use of the Androscoggin river, for floating of lumber to the place of its destination, are equal. Neither can wantonly or unnecessarily obstruct

the other, to his injury. Each is bound to the exercise of ordinary care and due diligence, but nothing more; the extent of the use, and the mode of enjoying it, must be such as is required by the nature, circumstances, and exigencies of the case, and in conformity with the usages of the country.

Embraced in the right to use the river for the purpose of floating timber or other commodities to market, is the right of stopping the articles so floated, at their place of destination, and of occupation of the river for that purpose, in a proper and reasonable manner.

The right to *float*, without the right to stop and secure, is no right. This also must be exercised with ordinary care and proper diligence. If, notwithstanding such care and prudence, damage ensue to others who have an equal right to the use of the river, it is the not infrequent case of " *damnum absque injuria.*"

In the case at bar, the defendants are not responsible for the injuries complained of, if those injuries were the *necessary and inevitable* results of the *lawful* use and occupation of the river. If there be no ingredient of negligence or wantonness in the act complained of, the action cannot be maintained. " But, where the injury is not to be traced to any evil motive, the rule is by no means universal that injury is always entitled to redress." 1 Hilliard on Torts, (2d ed.,) 107, § 18; Ib., 112, § 23.

The case at bar is like the case of several mills on the same stream. The upper have, of necessity, priority in point of time, over the lower in the use of the running waters. But this implies no superiority of rights. The rights are equal. Yet, if, in the proper use by the owner of the upper mills, the waters are stopped to the injury of the lower, no redress can be had. No *wrong* is done, though *injury* may be.

These are familiar doctrines, standing upon the soundest principles of right and justice, and supported by numerous authorities.

2 Gray, 394, *Thurber* v. *Martin*, the charge to the jury at the trial, was, that "every proprietor, at points further down the stream," shall have the enjoyment of it, "subject to such disturbance and interruption as was necessary and unavoidable in and by the reasonable and proper use of it," &c., &c., by those higher up.—p. 395. This held correct. p. 396.

The Court say, "in determining what is such reasonable use, a just regard must be had to the force and magnitude of the current, * * * the general usage of the country in similar cases, and all other circumstances bearing upon the fitness and propriety of the use of the water in the particular case."

So, in 7 Gray, 348, *Chandler* v. *Howland & als.*, the Court say, "the doctrine of the most recent case, on this subject, requires the owner of the upper mill to use the water in such manner, that every riparian proprietor further down the stream shall have the enjoyment of it, substantially, according to its natural flow, subject to such interruption as is necessary and unavoidable, by the reasonable and proper use of the mill privilege above" *and seq.* 13 Met., 157, *Pitts & als.* v. *Lancaster Mills.*

Per SHAW, C. J.—"What is a reasonable use, must depend on circumstances; such as * * * the previous usage * * improvements," &c. "Detention no longer than necessary" for a lawful purpose. 12 Cush., 180, *Inhabitants of Shrewsbury* v. *Smith & als.*

30 Maine, 178, *Noyes* v. *Shepherd.*—Per SHEPLEY, C. J.—"The rules of law applicable to cases of injury occasioned by the lawful acts of one party, to the property of another, appear to be quite well settled. A person is required so to conduct in the exercise of his own rights, and in the use of his own property, as not to do an injury by his *misconduct* or by the *want of ordinary care* to the rights or property of another."

8 Met., 476, *and seq.*, *Cary* v. *Daniels*, discusses these general principles elaborately—q. v. compared to the rights

of use of highway — for which, see 14 Gray, 69, *Com.* v. *Temple.* "Again, * * * each is bound to a reasonable exercise of his absolute right in subordination to a like reasonable use of all others, * * and to remove the obstruction within a reasonable time, to be determined by *all the circumstances of the case.*"

35 N. H. Rep. (4 Fogg,) 257, *Groves* v. *Shattuck,* action for damages by obstructions in a highway — question, "whether under *all the circumstances* attending, it *unnecessarily* obstructed the road" — see charge p. 260-1 — "if, in the reasonable use, causing no *unnecessary* obstruction" — this charge sustained — p. 264-5 — "cannot be a nuisance to use a street as they have been used" — cases cited, p. 267. "Necessity justifies actions which would otherwise be nuisances; not an *absolute necessity,* but a reasonable one." 9 Pick., 528, *Boynton* v. *Rees;* 1 Allen, 188, *Gahagan* v. *Bos. & Low. R. R.* See instructions, p. 188 — held correct, p. 190.

44 Maine, 167, *Dwinal* v. *Veazie,* and the more recent cases between the same parties, 50 Maine, 479, recognize and reäffirm the general principles established by the cases above cited.

"Reasonable care and skill is a relative phrase, and what this requires, is always to be determined by a consideration of the subject matter to which it is applied." 4 Allen, 276, *Cunningham* v. *Hall.*

"What is reasonable care, or due care, depends, in every case, on the subject matter to which the care is to be applied, and the circumstances attending the subject matter, at the time when care is to be applied." 3 Allen, 566, *Sullivan* v. *Scripture.*

"Negligence is said to consist in the omitting to do something that a reasonable man would do, or in the doing something a reasonable man would not do, causing, unintentionally, mischief to another. A party who takes reasonable care to guard against accidents arising from ordinary causes,

is not liable for accidents arising from extraordinary causes."
1 Hilliard's Torts, 131, § 38.

"The test of exemption from liability, for injuries arising
from the use of one's own property, is said to be the legiti-
mate use or appropriation of the property, in a reasonable,
usual and proper manner, without any negligence, unskil-
fulness or malice." 1 Hill. Torts, p. 126, note a, cites 22
Barb., 297, *Carbart* v. *Auburn*, &c.

Applying these principles to the case at bar, we maintain
that the instructions were erroneous; that the verdict was
wholly unsustained by the evidence; and that great injus-
tice will be done, if it be allowed to stand.

*All the circumstances* of the case are to be considered.
What are they?

1. The defendants' logs had reached their destination.
They were there to be separated and set apart from all
others. The only mode of accomplishing this was to ar-
rest the downward progress of the whole; and, for this pur-
pose, there was no other method but a boom stretched
across the river; — a mode in conformity with the *universal
practice* and usage of the country, and without which the
defendants would be deprived of their *equal* right to the
lawful use of the river.

2. The intermingling of the logs of the plaintiffs, with
those of defendants, was against the will of defendants, and
without any fault on their part. They endeavored to pre-
vent it, by the erection of a boom across the Magalloway,
which defendants removed, against the remonstrance of
plaintiffs, each acting by agents. The blame for interming-
ling, if any, was on plaintiffs.

3. The river, at the time in question, was at an unusual
height, and the current consequently uncommonly rapid,
rendering it more than ordinarily difficult to manage and
control the floating timber; a fortuitous event, for which
defendants are not liable. The accumulation of logs was
also much larger than was anticipated or usual; also fortu-
itous, or occasioned by acts of plaintiffs.

The whole quantity received into the boom was about nine millions feet at board measure; and of these 8,267,579 feet belonged to the defendants, or to others, at whose request they were to be stopped there, leaving about 850,000 feet only, belonging to plaintiffs. Of these, about 450,000 were old logs, bought of Lynch, and 400,000 of new pine logs. Both these came from the Magalloway. The *old* logs (450 M.) were, by the *express agreement* of plaintiffs, to be detained at the boom for delivery, and to be counted.

Thus, of the *whole quantity* received and detained in the Milan boom, only about 400 M. — less than 1-20th part, were destined for places below. What, under such circumstances, was "*reasonable*" and proper for parties enjoying *equal rights*, to do? Was it "reasonable," that defendants should suffer the almost total loss of their very large stock of logs, and the consequent non-uses of their extensive mills, rather than expose the plaintiffs to the *temporary* inconvenience and comparatively small injury they would be likely to sustain, by a brief detention of their logs, so few in number?

4. The *new* logs of plaintiffs were, *at their request*, taken into a drive, *the whole of which* was destined for, and intended to be stopped at, the Milan boom; and this must have been known to some, if not all of them. The instructions of Lynch, one of the plaintiffs, were, "*to detain at the boom.*"

They knew that, by agreement between plaintiffs themselves, the old logs were to be counted and turned out at the boom, and therefore to be stopped there; and when they requested the new to be driven with the old, they must be held as assenting to have them stopped with the old. They therefore consented to the detention. "*Volenti non fit injuria.*"

"An action cannot be maintained to recover damages for an act which the plaintiff himself has expressly or impliedly authorized or sanctioned." 1 Hilliard's Torts, § 28, p. 185.

* * "A party is estopped or precluded from complaining

of an interference with his property, upon the ground that, by his own conduct or declarations, he has impliedly authorized such interference." Ib. § 31, p. 187.

The request by Lynch, one of plaintiffs, to stop his individual logs at the boom, knowing that it could not be done without stopping plaintiffs' also — they being in the same drive — was full license to stop plaintiffs' logs also.

Lynch admits that his pine logs were to be held back. The *new* logs of the plaintiffs do not appear to have been driven, because of their intermixture originally with the rest of the Magalloway drive.. They were taken with it voluntarily, and because the plaintiffs wished it, and not because of necessity. They might have been left. If the plaintiffs voluntarily caused them to be intermingled with others, they should share the fate of others.

5. The evidence in the case shows no want of care and diligence, in any respect, or at any time, on the part of the defendants. The assortment and separation, and turning out of the logs, commenced and was prosecuted as early as practicable under the circumstances, and with every possible despatch. The testimony to this, places the matter beyond all controversy.

6. The instructions of the presiding Judge hold the defendants liable, for having allowed so large an accumulation to take place, thereby becoming dangerous to the community, and creating a public nuisance. We answer, that so far as this was occasioned by the unusual stage of the water, bringing an unexpected number of logs, it was an act of God; and so far as it was occasioned by the act of the plaintiffs, in removing the impediment we had placed in the Magalloway, it was their own fault; and, in either aspect, we are not liable.

It was out of the power of the defendants to prevent so large an accumulation, but by submitting to the almost total loss of all their own logs; a sacrifice they were by no means bound to make.

Further, the evidence does not show, and the result does

not warrant the assumption, that the mere *accumulation* of the logs, however great, was dangerous to the public, or constituted a nuisance. It was the undertaking *to move the logs*, for the purpose of separation, at such an *unusual state* of water, that constituted the danger and the nuisance ; and from that we refrained.

Besides, the plaintiffs have no ground of complaint, or cause of action for anything that occurred, or was done, prior to 3d June, — the time when Gerrish demanded the logs to be turned out.

Up to that time, at least, they were detained by his and the other owners' consent. He was one of the owners, acting for the others ; and yielded to the absolute and imperative necessity of the case, according to his own statement.

According to others, he consented to their detention until the water should have fallen two feet; which did not occur till some time after 3d, — and indeed after 10th or 11th June, — when the process of separation commenced.

Again, the maxim, "*volenti non fit injuria*," applies. See cases already cited.

If the prior accumulation constitutes the gravamen of the action, that is all condoned and waived by the subsequent assent of the plaintiffs ; and the question will then be, were the defendants guilty of any negligence, or did they commit any wrong, by an unreasonably and unnecessary detention of plaintiffs' logs, *after* 3d or 10th June?

7. Gerrish, (plaintiff,) says that, on the 27th May, "few of our logs had come down." Of course, few only could then have been turned out; and "few," therefore, could have been detained. Was it reasonable to require that so great hazard should have been incurred, for so comparatively insignificant an object? The great mass of the Magalloway drive came in from 1st to 4th of June, and were turned out as soon thereafter as was practicable under the circumstances.

8. The policy indicated by our statutes, relied upon by

Davis *v.* Winslow.

the plaintiffs at the trial, is in entire consonance with these views. R. S., c. 42, §§ 5, 6.

They recognize the impracticability of a separation of different marks of logs, intermingled together on running streams; and provide that the whole may be driven together. If driven together, because of the impossibility of a separation, why not stopped together for the same reason, when it becomes absolutely indispensable to stop them, for the lawful purpose of a separation, and securing to each owner his right?

9. It will not be pretended, that the doings of the defendants were wanton or malicious, or intentionally injurious to plaintiffs. Some slight effort was made at the trial, to show that the detention was desired by the defendants, because of the insufficiency of their side booms, lower down, to receive all their logs. Gerrish is the sole witness to this, and he is refuted by Gould and Winslow.

Some of plaintiffs' witnesses give conjectural opinions, that, if the logs came in *gradually*, at the rate of 500 M. a day, they might all have been sorted and turned out as fast as they came in. Vague speculations all. They came in day and night—not *gradually*, but tumultuously,—and could only be turned out by day. As near as can be ascertained, they all came in within a period of about nine or ten days,—a million a day.

They might have been turned out as fast as they came, provided they had all been turned down river together. But this was not their destination.

10. If the defendants were justified in *any* detention of plaintiffs' logs at all, they were justified in detaining them for so long a time as was requisite, with proper care and diligence, to effect the separation. No other sensible rule can be applied.

What is a reasonable time cannot be measured by days or hours. Who can fix, *arbitrarily*, and without regard to the object to be accomplished, any length of time, in days or weeks, which can be considered reasonable; and be-

yond which it would be unreasonable? The rule must be founded on some philosophical principle, — clear, precise, and of easy application.

If the thing to be done be legitimate and proper, time enough to do it must be granted; and not any arbitrary period, which may not be half sufficient for the purpose.

In cases like this, "good faith, sound discretion, and prudent management, so far as the rights of others are involved," are required; and, when these are observed, no liability should attach. *Foster* v. *Cushing*, 35 Maine, 61.

*E. & F. Fox & Hammons, contra.*

The admitted facts are amply sufficient to sustain a verdict for the plaintiffs.

(1,) The place was admitted to be a public highway, capable of being used for floating logs and timber to market.

(2,) That the defendants, *for their own convenience*, erected the boom complained of, and kept it across the river; and thereby detained plaintiffs' logs, hindering them from reaching their destination so soon as they otherwise would, and that thereby the plaintiffs were damaged.

What are the rights of the public in public rivers and highways?

WESTON, C. J., in *Berry* v. *Carle*, 3 Greenl., 273, says, "By the common law, rivers, as far as the tide ebbs and flows, are public and open for the use and accommodation of all subjects or citizens, and any obstructions erected or continued therein is a common nuisance, and may be abated as such. So rivers and streams, above where the tide ebbs and flows, although the land over which they pass belongs to the owners of the adjoining banks, yet, if they have been long used for the passage of boats, rafts or timber, although they have not the character of public rivers, within the meaning of the common law, yet they thus become public highways, and, like other highways, are to be kept open and free from obstruction."

Also, remarks of SHEPLEY *arguendo*, on p. 272, — "Even

booms cannot be erected without leave of the Legislature, and the grant of such leave shows that they would otherwise be nuisances."

In *Wadsworth* v. *Smith*, 2 Fairfield, 280, PARRIS, J., says, — "Those which are sufficiently large to bear boats or barges, or to be of public use, in the transportation of property, are highways by water, over which the public have a common right." "*Such rivers, therefore, cannot lawfully be so obstructed*, even by the owners of the banks and bed, as to interfere with this public right." If, therefore, Ten-mile brook, was naturally of sufficient size to float boats or mill logs, the public have a right to its free use for that purpose, unencumbered with dams, sluices or tolls, and no man can lawfully thus encumber it, without the public permission." The same doctrine is recognized in *Scott* v. *Wilson*, 3 N. H., 321.

In *Brown* v. *Chadbourne*, 31 Maine, 26, the Court say, "the right of way is in the waters, and the defendant had no authority to prevent its exercise. He could, by law, erect and continue his dam and mills, *but* was bound to provide a way of passage for the plaintiff's logs. He obstructed the river improperly by his dam and logs."

In *Knox* v. *Chaloner*, 42 Maine, pp. 155 and 156, the rights of parties as to use of navigable waters are very fully examined by APPLETON, J., and it is there decided, that "the right of passage of the public, in navigable waters with their mill logs, is paramount to the mill rights under the statute." That all hindrances or obstructions to navigation, without direct authority from the Legislature, are public nuisances, (and most certainly a boom without any legislative authority,) which impedes or obstructs the right of the public in floating logs in a stream, in which they can be floated in its natural state, must be held, *pro tanto*, a nuisance. See also Angell on Watercourses, §§ 554, 555.

Fifty years ago, in *Arundel* v. *McCulloch*, 10 Mass., 70, it was decided, that it was an unquestionable principle of the common law, that all navigable waters belong to the

public, and that no individual or corporation can appropriate them to their own use, or confine or obstruct them, so as to impair the passage over them, without authority from the Legislative power. When any public way is unlawfully obstructed, any individual who wants to use it in a lawful way may remove the obstruction, and the defendant in this case was justified in cutting down a bridge, over a navigable river, which had been erected over fifty years.

The boom being thus a public nuisance, and, as the case finds, erected by the defendants for their convenience, and proving detrimental to us, we had a right to cut it away, or may recover compensation for any damages we have sustained by reason of it. *Cole* v. *Sprowl*, 35 Maine, 169; *Sutherland* v. *Jackson*, 32 Maine, 80.

In *Brown* v. *Watson*, 47 Maine, 161. Where one returning home, with a loaded team, is stopped by obstructions placed in the highway, and compelled to take a more circuitous route, he is entitled to recover his damages from the person who placed the obstructions there. "For an injury to a private person by a common nuisance, however inconsiderable, he may maintain an action."

This principle has been applied to the obstruction of a public navigable creek, and a party thereby injured has recovered his damages, in *Rose* v. *Miles*, 4 M. & S., 103,

The defendants, being wrongdoers, having no right to obstruct the passage of logs, in the river, are responsible for all consequences of their illegal acts. The doctrine is well stated in Hilliard on Torts, 2d Ed., 112, "if an illegal act be done, the party doing or causing the same to be done is responsible for all consequences resulting from the act."

These, we think, are the legal principles which are applicable to the case, to determine the rights of the parties, and we believe nothing can be found in the rulings of the presiding Judge in conflict with them; and a verdict for the plaintiffs for some damages necessarily followed on the undisputed facts of the case. *     *     *     *     *

The case finds, that both parties contended that the rea-

Davis *v.* Winslow.

sonableness or unreasonableness of the detention was for the jury, and the jury were instructed, that they might determine this question from the evidence in the case, *with the consent* of the counsel for both parties.

This being *by consent*, and the jury having passed upon it, the party has no cause of exception. "A party cannot except to any proceedings of a court, which takes place at his request or by his consent." *Mudgett* v. *Kent*, 18 Maine, 349.

Whether the jury came to a right conclusion, or not, upon this point, it is no ground for a new trial; it is the same as the finding of referees; the parties have selected their own tribunal to settle the fact, and should be bound by its findings.

The defendants' counsel starts with the assumption " that the injuries complained of were the necessary and inevitable result of the lawful use and occupation of the river." We think we have shown that he is in error, and that the defendants acted illegally in erecting their boom and detaining so large a quantity of logs therein as to endanger the property of others and create a public nuisance.

If we are right in these views, it follows, that all his suggestions as to ordinary care and proper diligence are inapplicable. These defendants are wrongdoers, responsible for all the consequences of their acts, notwithstanding they use ordinary care and prudence in their illegal proceedings. * *

If this defence is to prevail, the lower mill owners will be wholly in the power of those up river, and it would take half a dozen years for a drive of logs to get down; each boom owner asserting the right to detain the logs, because of the rise of water, and his own necessities, and the result would be, that most of the logs would be utterly spoilt before they reached their destination; the detention would also be constantly resorted to, to compel the sale of logs, rather than put the owners to the trouble and delay of waiting for them, and great damage and mischief would result from it. It is a strong argument against the defendants,

that no one ever before has asserted any such right, and the logs on all other rivers have been allowed to run with the freshet.

It is most manifest that proper diligence and care were not used by the defendants; they could have easily prevented such an accumulation of logs, and, by proper management, and a larger number of men, could have prevented such a jam, and turned our logs down with the benefit of the rise. We do not believe that "there was either good faith, or sound discretion, or proper management;" but all this was for the jury, and they have settled it in favor of the plaintiffs.

*Evans,* for defendants, in reply : —

The *general* proposition contended for by the plaintiffs, viz. : that obstructions to highways and navigable streams constitute nuisances, which may be abated, is not controverted. But, like all *general* propositions, it is subject to qualifications and limitations. The broad, unqualified proposition, that no person can at any time, or under any circumstances, or for any purpose, obstruct a highway or navigable stream, even though it be to the injury of another, without incurring legal responsibility, is *not true.*

Highways, whether on land or water, being for the common use, every person has an equal right with every other person, to their enjoyment.

The use of them by one, of necessity, to some extent, obstructs and impedes the use of them, at the same time, by another, and it may be to his great injury.

Has he thereby created a nuisance? Is he liable for the damages which the other has sustained? Has he done a wrong? Certainly not, if he has conducted with reasonable care and diligence.

In every case, therefore, the inquiry is, how is the obstruction complained of created? What is its nature? Permanent or temporary?

If permanent, as by dams or buildings or other similar

Davis *v.* Winslow.

erections, they are indisputably nuisances, — no lawful authority being shown for their existence. If temporary, how and for what purpose occasioned? If occasioned by the actual use of the same highway by another, in the legitimate and proper pursuits of his own business, in a careful and prudent manner, certainly no nuisance is created which imposes any liability whatever. There may be an obstruction and an injury, but there is no ground of action.

The *general* proposition, that *every* obstruction in a public highway, occasioning individual injury, is a private nuisance for which an action will lie, is not therefore universally true. Whether it be so or not, in any given case, depends upon whether it is occasioned by the lawful or unlawful, proper or improper acts of one in the enjoyment of his own rights.

The authorities cited by the plaintiffs' counsel all go to support the *general* proposition, but no further. The learned counsel argues that, it being admitted that the acts of the defendants occasioned the detention of plaintiffs' logs, to their injury, the action is, upon the general principle, maintained, and the verdict should stand.

Still the question remains, were the acts, under the circumstances, *necessary* and justifiable?

The temporary hanging or closing of the boom, which is the obstruction complained of, was *indispensable* to the enjoyment of the defendants' rights in the common highway. If they could not do that, they could have no use of it. The boom was *indispensable.*

The obstruction, then, was an obstruction *inevitably* and *necessarily* occasioned by the use of the public highway, by those having an equal right to the use of it, with the plaintiffs, and the whole community. It was an inevitable incident to the use at all. It was utterly impossible for the defendants to enjoy their rights, without occasioning the obstruction. None of the cases, cited on behalf of the plaintiffs, hold the defendants responsible under circumstances like these.

The learned counsel for the plaintiffs makes no allowance

for these considerations. He argues in the broadest terms, *every obstruction*, however occasioned to a navigable stream, is *illegal*, and imposes liability. Here was an admitted obstruction, *ergo*, &c.: or thus — "The defendants being *wrongdoers*, having no right to obstruct the passage of logs in the river, are responsible for all consequences of their *illegal* acts." We admit responsibility for *illegal* acts, but we deny the *illegality*, we deny being wrongdoers. We claim the *clear*, *legal*, *undoubted right* ourselves, to use the river to *run our logs*. This is what we did, and all we did, and, if·in doing it, we necessarily did impede and obstruct the plaintiffs temporarily, we did not thereby become wrongdoers, our acts were *not* illegal, and we created no nuisance for which an action can be maintained. The cases cited by us in opening are decided to this point. None are adduced to the contrary.

The counsel *assumes*, and reiterates that the acts we did were *illegal*, and hence deduces the liability he would attach to them, but he offers little argument and no authority to ·establish their illegality. His major proposition in the syllogism is, — " every obstruction, &c., is illegal."

This we deny, obstructions occasioned by the proper use of the river by another, having right, are *not* illegal. The premises failing, the conclusion necessarily fails also.

" The boom being thus a public nuisance," says the counsel, "may be abated or an action brought." This is leaping to a conclusion quite too summarily. Let it be first established that, under the particular circumstances of the case, the.boom in question *was* a public nuisance. This we deny. A boom; it is admitted, *may be* for the time being an obstruction, and like any other obstruction *may* be — not *must* be, illegal or a nuisance, depending upon circumstances.

If it be a fit, suitable, customary and appropriate means, and especially if it be an *indispensable* means, of securing floating timber, then the owner of such timber, for such purposes, may lawfully resort to it, and if he conduct with caution and prudence and ordinary skill and diligence, he com-

mits no nuisance and incurs no liability. To hold otherwise is to deprive him of the useful enjoyment of his most unquestioned right.

In *Brown* v. *Watson,* 47 Maine, 161, cited by plaintiffs, the obstruction appears to have been wholly wilful; there was no pretence of necessity for it; it was not occasioned by the exercise of any lawful right on the part of defendant. It has no bearing on any question arising in the case at bar.

The same remark applies to the cases of *Cole* v. *Sproul,* 35 Maine, 169, and *Sutherland* v. *Jackson,* 32 Maine, 80, cited by plaintiffs' counsel. In both, the obstructions were occasioned by *permanent erections* in a public highway, without any pretence of right. The injury was not a necessary and inevitable one growing out of a proper exercise of the rights of defendants, as is the case here. The principle involved here, was not touched in either case.

*Knox* v. *Chaloner,* 42 Maine, 155–6, is referred to by the counsel for plaintiffs as illustrating the rights of parties to the use of running waters. There is no legal principle asserted in the case, to which we make the slightest objection. The spirit and scope of the decision there goes to uphold the right to the use of the stream for the purpose of floating logs to their destination. The object to be attained, by the use of the water, is securing the lumber in the place where it is wanted.

Now that is precisely what the defendants, in the case at bar, did, in the acts which are complained of. They were in the use of the stream to drive their logs to their destined place. We contend, as earnestly as the plaintiffs can, for the legal principle, that, in the pursuit of this lawful object, they cannot be hindered or obstructed. If they are entitled to the use and control of the waters, to attain this end, they are entitled to them in the only way in which it can be accomplished — the usual, customary efficient mode. If they cannot employ this mode, then they are the party who are hindered and obstructed in getting their logs to their place

of destination—their rights in the common highway are taken from them.

*Brown* v. *Chadbourn*, 31 Maine, 26, cited by plaintiffs, and others like it, of obstructions by means of dams and other permanent erections, leaving no sufficient passage way for logs, are not analogous to the present, and general remarks of the Court, in such cases, have but little application to the circumstances here presented.

"He obstructed the river *improperly*," is the language of *Brown* v. *Chadbourn*, and similar is that of all analogous cases. In that case, the dam could have been constructed so as to answer all the purposes of the owner, and still leave a passage way for logs. The rights and interests of both parties might have been preserved. The neglect to do this was the wrong complained of and the ground of liability. But, in the case at bar, this was impossible. The defendants could not enjoy the beneficial use of the river, for driving their logs, in any other mode than that they adopted. The injury thereby occasioned to plaintiffs was inevitable—one of absolute and dire necessity—wholly different from that in any of the decided cases referred to.

What the defendants contend for, is, the right to use the Androscoggin river for the purpose of floating logs to their mills for manufacture, in the usual manner of conducting such business, and in conformity with the usages of the country, free from liability, except for negligence or want of ordinary care and diligence on their part. They maintain this, as a *legal* proposition, and they complain that such was not the instruction to the jury, but the reverse.

If the defendants had the right claimed to the use of the river, how were they to enjoy that right in any other mode of proceeding than that which they adopted? What should they have done to stop their logs at their point of destination, which they did not do? Or omitted to do, which they did? What error or wrong did they commit, having, as must be conceded they had, the perfect right to drive their logs to the place of manufacture? Nothing has been pointed

Davis *v.* Winslow.

out, or is pretended. No other feasible mode of accomplishing the object is suggested—none can be.

It is not pretended that the defendants' mills, at Berlin Falls, are located at an unsuitable or improper place, not adapted to such operations—on the other hand, the situation is eminently adapted to the purpose—a natural site and water power of great capacity, unequalled on that river. The plaintiffs, on the other hand, have no natural power or advantages. Their's is a steam mill. The long established policy of the State and the country, has been to foster and promote the occupation and development of its *natural advantages* and resources—and hence peculiar inducements are held out to the erection of water mills, not offered to those of a different description.

The restrictions sought to be imposed on defendants, in this case, are directly repugnant to this long cherished policy, and find no support in our statutes or adjudicated cases on analogous subjects.

There is a good deal in "the way of putting a case." The plaintiffs' counsel inquires, "what right had the defendants thus for their own private purposes and benefits to obstruct a highway and injure others who had an equal right with themselves to pass over it?" This is adroitly put. We claim no right to *obstruct* the highway, for private benefit.

We claim the right to *use* the highway, properly and legitimately, and if such use of it, of necessity occasions some temporary obstruction, it is not an unfrequent consequence. The books abound in cases where the rightful use of one's own injures another, but where no remedy can be had.

The ruling of the presiding Judge was, that the use of the water thus made by the defendants, was *unreasonable*, therefore *unlawful*. This was stated as matter of *law*, and being *unlawful*, the defendants were liable.

Why it was *unreasonable* is not stated. Was the object to be accomplished *unreasonable?* Certainly this will not

be pretended. Was there any other practicable mode of doing it? None is shown or suggested, and none can be imagined.

The ruling then, in effect, denies to the defendants the equal right which they have in the waters of the river for carrying on their mills.

2. The learned counsel supposes that we are precluded from complaining of the instructions to the jury upon this point, because, by the consent of parties, the question of reasonableness or unreasonableness was submitted to them, and their verdict is conclusive in the matter.

It is quite true, that both parties argued that question to the jury, and supposed that it properly belonged to them, under appropriate instructions, to decide. The instructions which were given were clearly decisive of the case. They were founded on no controverted facts. They assumed the case as made by defendants. They stated no alternative, in which a verdict should be found for defendants. In a word they cut up the defence, root and branch. Now, if these instructions were correct in law, our exceptions cannot be sustained, but if erroneous, they should not have been given, and our exceptions will be sustained, although it was left to the jury to pass upon the question of reasonableness or unreasonableness.

The opinion of the Court was drawn up by

DICKERSON, J. — Case, to recover damages sustained by the plaintiffs; in consequence of the stoppage and detention of their logs, by means of a boom erected by the defendants across the Androscoggin river, at Milan, in the State of New Hampshire.

It was admitted that the Androscoggin river, at the place in question, was a public highway, capable of, and being used for, floating logs and timber to market, and that the defendants, being owners of sawmills, at Berlin Falls, in New Hampshire, on said river, erected, for their own convenience and the operation of their mills, the boom com-

plained of, and that, at or about the time alleged, the defendants kept up said boom across said river, and thereby detained logs belonging to the plaintiffs, which were floating down said river, intermingled with logs belonging to the defendants, and thereby prevented said plaintiffs' logs from reaching their destination at Bethel steam mills, so soon as they otherwise would have done, and that thereby the plaintiffs suffered damage.

The case comes before us on exceptions and motion by the defendants. It is conceded that the Androscoggin river, at the place in question, is a public highway, capable of, and being used for floating logs and timber to market. While there is no controversy between the respective counsel with regard to the *general* proposition, that obstructions to highways, whether upon the land or water, constitute nuisances which may be abated, the learned counsel for the defendants denies that this proposition is universally true, and argues that, in the case at bar, it should be applied with limitations and qualifications which arise from the particular circumstances of the occasion.

It is to be observed, that general propositions are liable to be very much modified by circumstances; *in generalibus versatur error.* The difficulty oftentimes consists, not in understanding *the general* rule of law, but in applying it to the ever varying circumstances of particular cases. While, however, the general principles of the common law remain fixed, their adaptation to the vicissitudes of human affairs renders them sufficiently comprehensive to meet new institutions and states of society, and new systems of intercommunication between man and man, as they unfold themselves in the progress of civilization.

This peculiarity of the common law is, perhaps, nowhere more fully exemplified than in its application to public watercourses. As human society advanced from its primeval state, navigable rivers and public streams came to be the arteries of commerce, permeating parts otherwise inaccessible, developing occult mineral resources, and bearing upon

their bosom immense wealth to the more genial abodes of man. The history of our legislation, no less than the decisions of our courts, attest the solicitude of the community to make these great highways, both the means of developing the resources of the country, and of transporting their products to more remote regions. The various mill Acts, for the encouragement of milling, and the vigilance of courts to preserve a free transit for the various raw material and manufactures of lumber to a market, are so many proofs of this truth. " God," says Domat, " has given us the use of the seas and rivers, which opens the communication with all the world, to use, and makes us acquainted with our fellow men in distant countries."

The essential characteristic of highways is, that every person has an equal right with every other person to their enjoyment, and yet this enjoyment of them by one, of necessity, to a certain extent, interferes with its use by another. Water, air and light are the gifts of Providence, designed for the common benefit of man, and every person is entitled to a *reasonable* use of each. A man cannot occupy a dwelling, or consume fuel for domestic purposes, at least in our large cities, without, in some degree, impairing the natural purity of the air; nor can he erect a building, or plant a tree near the house of another, without, also, in some respect, diminishing the quantity of light he enjoys. Ordinarily, these being the necessary incidents to the common enjoyment, furnish no ground of action. The use of water, from its greater specific gravity, and the countless variety of purposes for which it is appropriated, gives rise to a larger number of perplexing questions. The detention of water, by a dam for the benefit of a mill, oftentimes results in an injury to the owners of the privilege below. It does not, however, follow that for every such injury there is a remedy. If the detention is indispensable to the owner's reasonable enjoyment of his rights in the common highway, and is continued no longer than is necessary for that purpose, the proprietor below is without remedy for any injury

he may have suffered thereby; otherwise, the right of common use is nugatory, and the party requiring such use is himself obstructed in its exercise.. *Webb* v. *Portland Manufacturing Co.*, 3 Sumn., 189; *Embrey* v. *Owen*, 4 English Law and Eq., 466.

The social duty, therefore, inculcated in the maxim, *sic utere tuo ut alienum non laedas*, must be understood, and applied with qualification. In *Inhabitants of Shrewsbury* v. *Smith & al.*, 12 Cush., 181, which was an action by a town against the owners of a dam, which had broken away and injured plaintiffs' bridge, the Court defined this maxim to mean, that each proprietor, in exercising his own rights on his own territory, should act with reasonable skill and care to avoid injury to others, and, as an approximate rule for measuring that degree, it should be that degree of ordinary skill, care and diligence, which men of common and ordinary prudence in relation to similar subjects would exercise in the conduct of their common affairs.

Where the legal effect of an act is the subject of judicial investigation, it is not unfrequently necessary to inquire into the subject matter, occasion, object, extent and necessity of the act, together with the manner and purpose of its performance. Was the subject matter appropriate, the object lawful, the occasion suitable, the extent reasonable, the necessity imminent, or the manner prudent? As these questions shall be answered by the facts and circumstances of the particular case, so will be the judicial determination of the legal consequences resulting from the act in question.

Reasonable use is the touchstone to which cases of this description must be subjected; and it becomes important, therefore, to examine the decisions of Courts upon this question.

1. *Of the use of water by riparian proprietors.*

In Pennsylvania the question arose with regard to the respective rights of the upper and lower riparian proprietors to the use of water for milling purposes. The presiding Judge instructed the jury as follows:—"The defend-

ant had a right to use the water as it passed through his land; if he detained it no longer than was necessary for his proper enjoyment of it, the plaintiff cannot recover; whether, if you believe, from the evidence in the case, that he did detain the water three days, at times, at other times, five days, at one time, thirteen days, in his own dam, to the injury of the plaintiff's mill, this was longer than was necessary for the defendant's proper enjoyment of the water, at his mill, as it passed through his land, is left for your determination. If you believe it was, you will find for the plaintiff; if you believe it was not, you will find for the defendant, unless you find that the defendant did maliciously or wantonly detain the water, or that there was some degree of malevolence in the time or quantity of water discharged to the injury of the plaintiff's mill; for, if you believe this, your verdict should be for the plaintiff." The verdict was for the defendant, and exceptions were taken to this ruling on the ground that the *time* the water was detained was so long and unreasonable that the plaintiff was entitled to recover; but the upper Court overruled the exceptions, and sustained the ruling, alleging as the ground of their determination, "the impossibility of making even a general rule for such cases, and that the matter was fairly submitted to the jury." *Hetrich* v. *Deachler*, 6 Barr., 32. *Thurber* v. *Martin*, 2 Gray, 394, also, was an action of tort for obstructing the natural flow of the water, and diverting it from the plaintiff's mill. In delivering the opinion of the Court, Chief Justice SHAW thus stated the law of the case:—"Every man has the right to the reasonable use and enjoyment of a current of running water, as it flows through or along his own land, for mill purposes, having a due regard to the like reasonable use of the stream by all the proprietors above and below him. In determining what is such reasonable use, a just regard must be had to the force and magnitude of the current, its height and velocity, the state of improvement in the country in regard to mills and machinery, and the use of water as a propelling power,

Davis *v.* Winslow.

the general usage of the country in similar cases, and all other circumstances bearing upon the question of fitness and propriety in the use of the water in the particular case."

The doctrine of *Thurber* v. *Martin* was expressly affirmed in *Chandler* v. *Howland*, 7 Gray, 350, where the Court say that the right of riparian proprietors to the natural flow of water over their lands is "*subject* to such *interruption as is necessary* and *unavoidable* by the reasonable and proper use of the mill privilege above."

In *Pitts & als.* v. *The Lancaster Mills*, 13 Met., 157, the defendants, owners of a mill and dam above an ancient mill-dam of the plaintiffs, rebuilt and raised that dam above its former height, whereby the water was wholly cut off from the plaintiff's mill for a period of six days, greatly to his detriment. The case was submitted to the Court upon an agreed statement of facts, and a nonsuit was ordered, the Court assigning as a reason therefor, that "this was not an unreasonable use of the watercourse by the defendants, and that any loss which the plaintiffs temporarily sustained by it, was *damnum absque injuria.*" "What is a reasonable use," the Court say, "must depend upon circumstances, such as the width and depth of the bed, the volume of water, the fall, previous usage, and the state of improvements in manufactures and the mechanic arts."

2. *Of the use of highways upon land and water.*

In the several cases, *Veazie* v. *Dwinel*, and *Dwinel* v. *Veazie*, 50 Maine, 479, this Court held, 1st, that it was not lawful for a mill owner to obstruct, with the waste from his mill, a channel made by another mill owner, as a passage way for rafts, logs, and lumber, from the former's mill on the Penobscot river, to and through the sluice, in the latter's mill-dam, and 2d, that the latter had no right to *permanently* obstruct this channel by a boom across it, designed to guide his logs into a new channel made by the former, though he might lawfully use this new channel as a passage way for his logs, and erect *temporary* guide booms for that purpose. These cases were submitted to the Court, who gave this

construction to the rights of the respective parties, as a reasonable use of the Penobscot river as a public highway for running logs.

In *Gerrish & al.* v. *Brown & al., ante* p. 256, it was held that, if a person obstruct a stream which is by law a public highway, by casting therein waste materials, filth or trash, or by depositing materials of any description, *except as connected with the reasonable use* of said stream or highway, or by direct authority of law, he does it at his peril, and is guilty of causing a public nuisance. In that case, the Court say, " the plaintiff, like any other citizen, may use the river as a highway for the purposes of navigation, and, as *incident* to the right of navigation, the *temporary* obstruction of portions of the river while preparing these materials for transportation, or *in securing them at the termination of their transit*, would not constitute a violation of law. In this respect, public streams are governed by the same general rule, as highways upon land."

A *temporary* occupation of a street, or highway, by persons engaged in building, or in receiving or delivering goods from stores, or warehouses, is lawful from the necessities of the case, while a persistent and continuous obstruction of a street beyond what is required for a reasonable use of it, even for such purposes, is unjustifiable. *People* v. *Cunningham*, 1 Denio, 526; *Commonwealth* v. *Passmore*, 1 Searg. & Rawle, 219.

In *Graves* v. *Shattuck & al.*, 35 N. H., 268, the plaintiff was obstructed by the defendants, while in the act of removing a building through one of the public streets of Nashua, and brought his action to recover damages occasioned by this act of the defendants. The right of the plaintiff, to encumber the street for such purpose, was put in issue, and the jury returned a verdict for the plaintiff, the presiding Judge according to the plaintiff that right, in his instructions to the jury. Exceptions were taken to this ruling, but the Court above sustained the instructions, and say, " the doctrine of all the cases on this subject that we

have examined seems to be in accordance with the instructions below, that the law justifies obstructions of a partial and temporary character from the necessity of the case, and for the convenience of workmen, when these obstructions occur in the customary, or contemplated use of the highway, and that the question of their necessity, and of the customary, or contemplated use, is one for the consideration and determination of the jury, under all the circumstances of each particular case."

3.  *Of the test of reasonable use.*

A person is required so to conduct in the exercise of his own rights, and in the use of his own property, as not to do an injury by his misconduct, or by the want of ordinary care to the rights or property of another.   What is reasonable care, or due care, depends, in every case, on the subject matter to which the care is to be applied, and the circumstance attending the subject matter at the time, when care is to be applied.   Negligence consists in the omitting to do something that a reasonable man would do, or in doing something that a reasonable man would not do, causing, unintentionally, mischief to another.   A party who takes reasonable care to guard against accidents, arising from ordinary causes, is not liable for accidents arising from extraordinary causes.

The test of exemption from liability for injuries arising from the use of one's own property is the legitimate use or appropriation of the property in a reasonable, usual and proper manner, without any negligence, unskilfulness or malice.   *Noyes* v. *Shepherd*, 30 Maine, 178 ; *Sullivan* v. *Scripture*, 3 Allen, 566 ; 1 Hilliard on Torts, 131, § 38.

4.  *Of the essential elements of a nuisance.*

If one, for his own benefit, violates the rights of another, it is a nuisance ; and if this consists in the violation of a public right, indictment is the appropriate remedy for its vindication and redress.   Neither express malice, nor a disposition, or desire to cause damage to another, as in case of malicious mischief, is necessary to the completion of the of-

fence. It is a nuisance if one wilfully seeks and pursues his own private advantage, regardless of the rights of others and in plain violation of them; it is a wrong done. And, as every man must be presumed to intend all the necessary, natural and ordinary consequences of his own acts, it is a wilful and intended wrong; it is malice in the eye of the law, and no other malice need be proved to show the act to be a nuisance.

Highways, whether on land or water, are designed for the accommodation of the public, for travel or transportation, and any unauthorized or unreasonable obstruction thereof is a public nuisance in the eye of the law. They cannot be made the receptacles of waste materials, filth or trash, nor the depositories of valuable property so as unreasonably to obstruct their use as highways. *Commonwealth* v. *Temple*, 14 Gray, 69; *Dwinel* v. *Veazie* and *Veazie* v. *Dwinel*, 50 Maine, 479; *Knox* v. *Chaloner*, 42 Maine, 150.

The authorities relied upon by the learned counsel for the plaintiffs are not essentially in conflict with the general current of decisions to which we have adverted. *Wadsworth* v. *Smith*, 11 Maine, 278, was a case of a *private* stream, and the general statement of Parris, J., with regard to the rights of parties to the use of navigable rivers was not elicited by the question at issue, and, taken in its strictly literal sense, is not entirely accurate. In *Brown* v. *Chadbourn*, 31 Maine, 26, it was held that a riparian proprietor has no right *permanently* to obstruct a public stream by a dam, and that, if he builds such a dam, he is required to construct and maintain a passage way by it.

So in *Knox* v. *Chaloner*, 42 Maine, 150, a dam over such a stream was held to be a nuisance. *Cole* v. *Sproul*, 35 Maine, 169, and *Sutherland* v. *Jackson*, 32 Maine, 80, were cases of the obstruction of *private* ways by the erection of buildings. In *Brown* v. *Watson*, 47 Maine, 161, the defendant obstructed the public highway by wantonly felling trees across it. In these, and the other cases cited by the plaintiffs' counsel to this point, the obstructions con-

Davis *v.* Winslow.

sisted of *permanent* erections, such as buildings or dams and the like, and were in no respect necessary to the use of the several highways, for the purposes of travel or transportation.

The general doctrine to be deduced from the authorities we have collated in reference to the use of navigable rivers, or public streams, as public highways, is, that each person has an equal right to their reasonable use. What constitutes reasonable use depends upon the circumstances of each particular case; and no positive rule of law can be laid down to define and regulate such use, with entire precision, so various are the subjects and occasions for it, and so diversified the relations of parties therein interested. In determining the question of reasonable use, regard must be had to the subject matter of the use, the occasion and manner of its application, its object, extent, necessity, and duration, and the established usage of the country. The size of the stream, also, the fall of water, its volume, velocity and prospective rise or fall, are important elements to be taken into the account. The same promptness and efficiency would not be expected of the owner of logs thrown promiscuously into the stream, in respect to their management, as would be required of a shipmaster in navigating his ship. Every person has an undoubted right to use a public highway, whether upon the land or water, for all legitimate purposes of travel and transportation; and if, in doing so, while in the exercise of ordinary care, he necessarily and unavoidably impede or obstruct another temporarily, he does not thereby become a wrongdoer, his acts are not illegal, and he creates no nuisance for which an action can be maintained.

Firemen, in extinguishing fires, builders, in erecting or removing buildings, teamsters, in hauling logs or masts to market, truckmen, in loading or delivering merchandize, shipmasters and boatmen, in receiving, transporting and delivering their cargoes, raftsmen, in managing their rafts, river drivers, in running logs, and mill owners, in securing

them, oftentimes, of necessity, require so much of a highway as temporarily to obstruct it; but, in such cases, they must so conduct themselves as to discommode others as little as is reasonably practicable, and remove the obstruction or impediment within a reasonable time, having regard to the circumstances of the case; and, when they have done this, the law holds them harmless.

The defendants, as owners of the upper mills, had a right to the reasonable use of the river, not only to float their logs, but also to arrest and detain them at their mill. The current was deep, broad and rapid, and the quantity of logs borne along by it was very large. Their logs had been intermingled with the plaintiffs' by the mutual act of the parties and in accordance with the established usage of the country. The means to be employed by the defendants in the work of separation and detention, and the time, mode, necessity and extent of their use of the river for these purposes, were subjects properly addressed to the practical judgment of the jury, under all the evidence in the case; and it was the right of the defendants to have them so presented.

The case finds, that the whole question of the reasonable use of the river was agreed to be submitted to the jury, and the presiding Judge instructed them that they might determine this question.

This was a waiver by both parties of their right to except to the instructions of the Judge upon the subject of the reasonable use of the river. Whether, therefore, those instructions were correct or erroneous in this respect, is not necessary for us to determine, since the parties, by their own act, have precluded themselves from the right to question their correctness; nor were they material to the issue, as the reasonableness or unreasonableness of the detention of the plaintiffs' logs by the defendants was left to the jury to determine.

After a careful examination of the evidence we are unable

to discover sufficient ground for setting aside the verdict, as prayed for in the defendants' motion.

*Exceptions and motion overruled, and*
*Judgment on the verdict.*

APPLETON, C. J., CUTTING, DAVIS, WALTON and BARROWS, JJ., concurred.